# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VIDYA SAGAR,

        *Plaintiff*,

     v.

STEVEN MNUCHIN, U.S. Secretary of the Treasury,

        *Defendant*.

Civil Action No. 14-1058 (RDM)

## <u>MEMORANDUM OPINION</u>

Plaintiff Vidya Sagar, proceeding *pro se*, was hired for a one-year probationary period by the U.S. Department of the Treasury and was terminated shortly before the year expired. According to the notice of termination, the Department decided to fire Sagar based on his conduct and performance. Sagar, however, sees it differently and alleges that he was the victim of age discrimination. He brings this action against the Department to challenge his termination, asserting three claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* He contends, first, that he was terminated because of his age; second, that the Department retaliated against him for engaging in ADEA protected activity; and, third, that he was subjected to a hostile work environment because of his age. The matter is now before the Court on the Department's motion for summary judgment, Dkt. 104. For the reasons that follow, the Court will **GRANT** the Department's motion.

## I. BACKGROUND

**A.      Factual Background**

On December 20, 2010, Sagar was hired by the Internal Revenue Service ("IRS") as an Information Technology Specialist at the GS-15 paygrade.  Dkt. 101-20 at 3–4 (Pl.'s SUMF ¶¶ 8, 11); Dkt. 104-21 at 1 (Def.'s SUMF ¶ 1).  He was 62 years old at the time.  Dkt. 104-21 at 1 (Def.'s SUMF ¶ 1).  Sagar was one of several Information Technology Specialists hired to help the IRS implement the Affordable Care Act.  *Id.* (Def.'s SUMF ¶ 1).  He was assigned to the Premium Tax Credit ("PTC") project, which was "build[ing] the application that calculates [the] applicable tax credit for taxpayers."  *Id.* (Def.'s SUMF ¶ 2).  Over the course of Sagar's tenure at the IRS, he had three managers.  The first two are the alleged discriminating officials: Matthew Brady, the PTC Section Chief and Sagar's direct manager, and Peter Gianakos, the PTC Branch Chief and Sagar's second-level manager.  *Id.* at 1–2 (Def.'s SUMF ¶ 3); Dkt. 64-6 at 6 (Interrogatory No. 11).  The third, Sagar's third-level manager, was also the individual who hired him: Gregory Barry, the Director of Compliance and Document Matching, within the IRS's Affordable Care Act Program Management Office.  Dkt. 104-21 at 1, 4 (Def.'s SUMF ¶¶ 1, 13).

Barry served as Sagar's direct manager until January or February 2011, when Gianakos became the Chief of the PTC Branch and thus Sagar's direct manager.  Dkt. 100-25 at 5–7 (Interrogatory No. 18).  In July 2011, Brady became the PTC Section Chief and replaced Gianakos as Sagar's direct manager.  *Id.* (Interrogatory No. 18).  In March 2011, Sagar was "named the requirements lead for the PTC project."  Dkt. 101-20 at 7 (Pl.'s SUMF ¶ 27).  His "primary responsibility" was to complete the Requirements Plan, Dkt. 104-21 at 2–3 (Def.'s SUMF ¶ 6), which "document[ed] the activities, methods, and techniques that w[ould] be used to

perform and support Requirements Development . . . and Requirements Management . . . for the Premium Tax Credit . . . Project," Dkt. 85-8 at 7.

According to the Department and one of Sagar's colleagues, Jonathan Lin, Sagar "began to have negative encounters" with Lin as early as February 2011. Dkt. 104-21 at 2 (Def.'s SUMF ¶ 4). Although Lin did not immediately bring these encounters to the attention of management, he kept a running list of the episodes on his work computer. Dkt. 104-6 at 7 (Lin Dep. 42:12–44:19); *see id.* at 22–23 (Lin's notes). According to those notes, during the first incident, Sagar (who was not Lin's supervisor) "lectured" Lin "in the break room," prompting Lin to email Sagar to ask that they "treat each other with professional courtesies." Dkt. 104-6 at 22. During subsequent incidents, Sagar purportedly told Lin that he was "not a team player" and "hung up" the telephone on him; interrupted Lin at a meeting with harsh criticism implying that Lin had "confuse[d]" two distinct concepts; and, at another meeting, "threw down his pencil and started to lecture" Lin for having interrupted him, only to then himself interrupt another participant. *Id.* at 22–23. Finally, Lin's notes report that, at a meeting on May 23, 2011, Sagar "grabbed the [telephone] microphone while [Lin] was speaking and moved it directly in front of him" and, then, "after he finished [speaking], he threw it across the table [in Lin's] direction." *Id.* at 22. As the parties describe it, the "microphone" was an extension of a "spider" conference phone, which was typically passed among participants during conference calls. *See* Dkt. 104-6 at 16 (Lin Dep. 112:4–16); Dkt. 104-21 at 2 (Def.'s SUMF ¶ 4). Sagar, for his part, disagrees with Lin's account. He asserts that he "treated Lin with respect and helped Lin," Dkt. 112-4 at 4 (Pl.'s Response to Def.'s SUMF); that Lin was "uncooperative [and had an] antagonistic attitude," *id.* at 10; and that Lin "made up [some of the] events [and] distorted facts . . . to get [an] outstanding [performance] rating," *id.* at 9.

The parties also disagree about the quality of Sagar's work as a Technology Specialist. According to Brady, when the template for the Requirements Plan was changed, the Plan "needed to be updated to follow the new template," but Sagar failed to do so in a timely manner. Dkt. 104-8 at 4 (Brady Dep. 35:20–22). The Requirements Plan, in Brady's view, "was not that complicated," and Sagar should have been able to update it more quickly and without assistance from others. *Id.* (Brady Dep. 37:20–22). But, because Sagar did not do so, the Project Manager, Walter Kirkland, needed to ask Sagar "numerous times" when the Plan would be completed, and Kirkland eventually "asked other team members, including Matthew Sikowitz, the only other GS-15 [Technology] Specialist in PTC[,] [to assist] in completing the . . . Plan." Dkt. 104-21 at 2–3 (Def.'s SUMF ¶¶ 6, 8). Moreover, the Department adds, Sagar once "called a meeting to discuss the . . . Plan, but[,] because he was not prepared to go forward, [Brady was forced to] cancel[] the meeting." *Id.* (Def.'s SUMF ¶ 7). Sagar, again, paints a very different picture. He alleges that, even though "[t]he project requirements were changing," he successfully completed the Requirements Plan in a timely fashion. Dkt. 101-20 at 7 (Pl.'s SUMF ¶ 29); *see id.* at 7–8 (Pl.'s SUMF ¶¶ 30–32); Dkt. 101 at 27 ("Sagar['s] three commitments . . . were completed [on] time, [and his] performance exceeded [the relevant standards]."); *id.* at 31 ("[E]vidence . . . show[s] that [Sagar] performed at an outstanding/exceptional level . . . ."). He further asserts— albeit in arguably contradictory terms—that he did so without assistance from others. Dkt. 56-17 at 3 ("With team input, the [Plan] was completed by me from start to finish."). As to the meeting that Brady claims to have adjourned prematurely, Sagar contends that the meeting was scheduled to last for "one hour" and that the meeting, in fact, "lasted an hour." Oral Arg. Tr. (Rough at 12:12–13).

In September 2011, Brady turned his attention to whether Sagar's employment with the Department should be terminated before the end of his probationary period. According to Brady, he was not only concerned about Sagar's performance, but had personally observed a number of "ongoing behavioral issues" involving "antagonistic" interactions with "other team members." Dkt. 64-6 at 34; *see id.* at 33–35 (Brady's narrative explanation, which was submitted to the Labor Relations Department, for why he recommended Sagar's dismissal). Brady noted, for example, that "[w]hen someone wished to speak[,] [Sagar] would hold up his hand and instruct [the person] in a firm voice not to interrupt him and" would admonish that person for "being rude," and that, as a result, "many of his team members [would] not speak while in a meeting with him due to intimidation and fear of being shut down." Dkt. 64-6 at 34. On other occasions, according to Brady, when "confronted with" a disagreement, Sagar would "say angrily[,] 'I'll shut up now,' and [would then] stop talking and . . . [would stop] provid[ing] input to the team." *Id.* Around this time, Brady asked other PTC staff whether they had had difficulties working with Sagar, and Lin showed Brady the notes that he had kept regarding Sagar's behavior. Dkt. 104-8 at 3 (Brady Dep. 33:14–19); Dkt. 104-6 at 7 (Lin Dep. 43:10–44:3).

Toward the end of September, Brady completed Sagar's annual evaluation, which referred to these conduct issues. Brady wrote, for example, that Sagar needed "to work more cooperatively with peers to promote a team environment;" that he "should . . . provide input even when there are disagreements with team members and [should] not shut down as [he has done] in meetings;" and that his demeanor at meetings "contribute[d] to a hostile environment." Dkt. 104-9 at 7. The evaluation also raised performance issues, noting that, "[a]s a senior technical staff member, [Sagar] should be able to complete assigned tasks without the intervention of the manager and project manager[,] as was the case for completing the Requirements Plan," and that

a "meeting had to be shut[ ]down by the manager" because Sagar's presentation "was not ready to be reviewed." *Id.* Based on these stated concerns, the review rated Sagar's performance as "[m]inimally [s]atisfactory." *Id.* at 9.

On September 29, 2011, Brady met with Sagar to present the evaluation. Dkt. 104-1 at 3–4 (Brady Decl. ¶ 7). Although the exact timeline is not crystal clear, at some point, Sagar "informed" Brady and Gianakos that the evaluation "was not consistent and was not true." Dkt. 101-3 at 5. In addition, Sagar asserts that he met with Gianakos "around October 3, 2011" for "a few minutes" and told him that "the review was incorrect, biased and vindictive," and that he met with Brady later that same afternoon, who said he would "look into the review on receipt of [Sagar's] response." *Id.* Sagar sent his "response" to Brady on October 5, 2011. *Id.* Among other things, his response asserted that "there seems to be some misunderstanding since I don't interrupt the thought processes of others that may be equally applicable or don't know the complete picture/context of the issue/discussion." Dkt. 56-17 at 2. Sagar's response also suggested that, going forward, he could improve workplace relations by bringing his experience as a graduate school teacher to bear in fostering the expression of "diverse opinions." *Id.* And, with respect to the Requirements Plan, the response noted that there was a "new template;" that "[t]he contents were still getting revised as we proceeded to complete" the Plan; that "we got it done relatively quickly;" and that, "[w]ith team input, the [Plan] was completed by me from start to finish." *Id.* at 2–3.

Brady and Gianakos, nonetheless, decided to "recommend termination during [Sagar's] probationary period." Dkt. 104-21 at 4 (Def.'s SUMF ¶ 12). On October 27, 2011, Gianakos met with Sagar and gave him the option of either resigning or waiting to receive "a written proposal/termination letter." Dkt. 41 at 23. When Sagar declined to resign, Gianakos sent Sagar

a letter, dated October 27, 2011, notifying Sagar of his decision to terminate his employment with the IRS. Dkt. 104-4 at 2–4. The letter noted that Sagar was a probationary employee and that "[t]he purpose of the probationary period was to allow [Sagar] the opportunity to demonstrate the skills, performance, and conduct necessary for continued employment with the Federal Government." *Id.* at 2. The letter then listed five "incidents in which [Sagar] failed to meet the expectations of [his] position [or] displayed unprofessional behavior," including:

(1)    On May 23, 2011, you displayed unprofessional behavior during a [meeting when] you grabbed the microphone from a colleague while he was speaking[,] placed it in front of you[,] [and, after] you spoke[,] . . . threw it across the table in the other employee's direction, which was very disruptive to others in attendance.

(2)    On May 26, 2011, you proceeded to chastise another employee after he interrupted you during a group discussion. You were visibly upset and proceeded to tell this employee that "gentlem[e]n should not interrupt other people while they speak[,]" [y]et . . . you displayed this very behavior when another team member was speaking.

(3)    On August 12, 2011, you were assigned as Requirements Manger for the PTC Project and were responsible for producing the Requirements Plan. The template for this project had been updated but follow-up conversations were required to further explain your responsibility to revise the plan documentation. You still did not understand your role as Requirements Manager, even after several follow-up meetings regarding the same. As a result, it became necessary to assign several junior staff members to assist you with the [P]lan.

(4)    On August 22, 2011, you scheduled a meeting and invited the entire team; however, you were not prepared to present and proceeded to make corrections during the discussion. Consequently, your manager made an executive decision to adjourn the meeting and asked others to step in and complete the document to avoid further delay.

(5)    On September 29, 2011, your manager met with you to discuss both performance and conduct issues. At this time, he offered advice on how to improve your communication and leadership skills. Unfortunately, you did not agree that there was any need for improvement.

*Id*. at 2–3.  The letter concluded that, "[a]lthough you have been counseled regarding the deficiencies in your performance[,] there has been no improvement in your performance as an Information Technology Specialist," and thus "[i]t is my decision to separate you from the Federal Service during your probationary period for your performance deficiencies."  *Id.* at 3.

A few days later, Sagar wrote to Barry—his third-level manager—to alert Barry to "certain events" that had affected Sagar's "career at the IRS."  Dkt. 100-20 at 2.  He explained that his annual performance review came as "a shock" and that the evaluation was a "180 [-]degree distortion."  *Id.*  He went on to assert that he was "one of the best in the technology field;" that he had "undertaken all assigned tasks;" and that, based on his "superior performance, there [was] no cause for the proposed threat of removal action."  *Id.*  Sagar also asked that Barry "consider [him] for one of the vacant positions [on] other projects."  *Id.* at 3.  Barry was unpersuaded, and he executed the Standard Form 52, terminating Sagar's employment with the IRS, effective November 2, 2011.  Dkt. 104-20 at 2–3.  On that same day, moreover, Sagar received Gianakos's letter dated October 27, 2011, setting forth the grounds for termination.  Dkt. 104-21 at 4–5 (Def.'s SUMF ¶ 14); Dkt. 104-4 at 2.

On November 4, 2011, Sagar sought equal employment opportunity ("EEO") counseling regarding "[w]hether [he was] disparately treated on the basis of [a]ge" when he was fired.  Dkt. 104-10 at 2–3 (EEO Counseling Report).  About a week later, he lodged a formal complaint with the Department, asserting that his termination was the product of age discrimination and retaliation and requesting reinstatement and backpay.  Dkt. 104-11 at 3.  The Department conducted an "administrative investigation."  Dkt. 104-21 at 5 (Def.'s SUMF ¶ 18).  Although neither party has directed the Court to any formal findings or decisions rendered in the Department's administrative process, the Department presumably upheld Sagar's termination.

**B.     Procedural History**

Following the conclusion of the Department's "administrative investigation," Sagar filed this action.  Dkt. 104-21 at 5 (Def.'s SUMF ¶ 18); *see* Dkt. 1.  His amended complaint, Dkt. 41, initially asserted six claims, which the Court construed in an earlier memorandum opinion as follows: age discrimination, retaliation, and hostile work environment claims under the ADEA, 29 U.S.C. § 621 *et seq.* (Counts 1, 4, and 6); two claims based on the Department's alleged violation of ethical rules and regulations under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* (Counts 2 and 3); and a claim under the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8) (Count 5).  *Sagar v. Lew*, 211 F. Supp. 3d 262, 265 (D.D.C. 2016).  On the Department's motion to dismiss, the Court dismissed Sagar's claims under the APA and the Whistleblower Protection Act.  *Id.* at 263.  Accordingly, the only claims remaining are Sagar's three claims under the ADEA.[1]  *Id.*  Sagar and the Department both moved for summary judgment.  *See* Dkt. 101 (Sagar's motion); Dkt. 104 (Department's motion).  The Court heard oral argument on March 14, 2018, and the Court denied Sagar's motion because he "failed to offer uncontroverted evidence" establishing that he was entitled to judgment as a matter of law on any of his three claims.  Minute Order (Mar. 31, 2018).  Accordingly, all that remains before the Court is the Department's motion for summary judgment on Sagar's three ADEA claims.

## II.  LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if he can "show[] that there is no genuine dispute as to any material fact and [that he] is

---

[1]  Sagar's motion for summary judgment asserts that "[t]he surviving claims" include "[h]arassment and [r]etaliation" under the ADEA and Title VII.  Dkt. 101 at 1.  Sagar, however, does not allege discrimination based on any characteristic other than age and, as explained in the Court's earlier memorandum opinion, his only remaining claims fall under the ADEA.  *Sagar*, 211 F. Supp. 3d at 263.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in his favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

# III.  ANALYSIS

The ADEA prohibits the federal government from discriminating against its employees aged forty or older on the basis of age, 29 U.S.C. § 633a(a), and from retaliating against them for complaining about age discrimination, 29 U.S.C. § 623(d).  *See Gomez–Perez v. Potter*, 553 U.S. 474, 479 (2008); *Kilby-Robb v. DeVos*, 246 F. Supp. 3d 182, 193 (D.D.C. 2017).  The statute's prohibition on age discrimination, moreover, takes two forms: it bars federal employers from taking age-based adverse employment actions against their employees, and it bars them from subjecting their employees "to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citation omitted).  Invoking all three prohibitions, Sagar asserts that the Department terminated his employment because of his age, retaliated against him for engaging in ADEA protected activity, and subjected him to a hostile work environment because of his age.

## A.  Termination Claim

Sagar first alleges that he was terminated from his position as a probationary Technology Specialist at the IRS because of his age.  To prevail on an ADEA discrimination claim, the plaintiff must establish (1) that he "suffered an adverse employment action" and (2) that his employer took that action "because of" his age.  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (noting that courts "generally apply the same approach in ADEA cases . . . as [they] do in Title VII cases").  The plaintiff may meet this burden with either direct or circumstantial evidence of discrimination.  *Holcomb*, 433 F.3d at 899.  Where the plaintiff relies on indirect or circumstantial evidence of his employer's intent, his claim is evaluated under the familiar

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (Title VII and ADEA discrimination); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII and ADEA retaliation).  "Under this formula, an employee must first make out a prima facie case of retaliation or discrimination.  The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action."  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted).

Once the employer proffers a legitimate, non-discriminatory or non-retaliatory reason, however, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case."  *Brady*, 520 F.3d at 494.  Instead, the Court should decide only two questions: "Has the employee produced sufficient evidence for a reasonable jury to find [1] that the employer's asserted . . . reason was not the actual reason and [2] that the employer intentionally discriminated against the employee on the basis of [age]?"  *Id.*; *see DeJesus*, 841 F.3d at 532–33 (applying *Brady* to ADEA claims); *accord Morris*, 825 F.3d at 668; *Allen v. Johnson*, 795 F.3d 34, 39 & n.4 (D.C. Cir. 2015).

The Court evaluates whether the plaintiff has carried this burden "'in light of the total circumstances of the case,' asking 'whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'"  *Nurriddin v. Bolden*, 818 F.3d 751, 758–59 (D.C. Cir. 2016) (alteration in original) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).  "[T]he ultimate burden of persua[sion] . . . remains at all times with the plaintiff."  *Jackson v.*

*Gonzales*, 496 F.3d 703, 706 (D.C. Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Here, the Department has proffered a number of legitimate, nondiscriminatory reasons for Sagar's termination: his unprofessional and at times hostile behavior toward his co-workers; his performance in preparing the Requirements Plan; and his reluctance to accept that his conduct and performance required improvement. Dkt. 104 at 19; *see* Dkt. 104-4 (termination notice). The Court, accordingly, must decide (1) whether Sagar has "produced sufficient evidence for a reasonable jury to find that the [Department's] reason was not the actual reason" why he was fired *and* (2) whether Sagar has "produced sufficient evidence for a reasonable jury to find that . . . the [Department] intentionally discriminated against [him]" based on age. *Brady*, 520 F.3d at 494.

  1.  *Direct Evidence of Age Discrimination*

The Court must first assess whether Sagar has adduced the type of direct evidence that would preclude summary judgment in favor of the Department. *See Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1246–47 (D.C. Cir. 2011) (evaluating a claim under the D.C. analogue to "federal anti-discrimination laws"); *Coats v. DeVos*, 232 F. Supp. 3d 81, 87 (D.D.C. 2017). According to Sagar, a number of age-related comments made by Brady and Gianakos—and their "surrogate[s]"—meet this burden. Dkt. 101 at 34–35. As explained below, the Court disagrees.

Under Sagar's theory of the case, Brady and Gianakos (his first- and second-level managers) decided to fire him because of his age and then convinced Barry, his third-level manager, to approve that decision. *See, e.g.*, Dkt. 101 at 49. Sagar offers no evidence that Barry held age-based animus, and, indeed, it was Barry who interviewed and hired Sagar less than a year before Sagar was terminated. Dkt. 100-24 at 2. As the district court held in an ADEA case

that Sagar brought against another former employer, "[f]iring a protected employee a 'relatively short time' after hiring him creates a strong inference against age discrimination." *Sagar v. Oracle Corp.*, 914 F. Supp. 2d 688, 696 (D. Md. 2012) (citation omitted), *aff'd*, 523 F. App'x 999 (4th Cir. 2013). That, however, does not dispose of Sagar's claim. Under the "cat's paw" theory, "an employer can be liable when a direct supervisor harbors discriminatory animus and influences the ultimate decision maker, even if that decision maker lacks any discriminatory animus." *Noisette v. Lew*, 211 F. Supp. 3d 73, 94 (D.D.C. 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)). Thus, the Court must still consider whether Sagar has proffered any evidence from which a reasonable jury could find that Brady or Gianakos decided to terminate Sagar's employment because of his age. The Court first concludes that Sagar has failed to offer any direct evidence of any such age-based animus.

Starting with Brady, Sagar asserts that Brady "commented about [his] age and [said] that [he] looked great for [his] age," Dkt. 101 at 34, "inquired about [his] age," and told Sagar on "multiple" occasions that he "was old and experienced," Dkt. 101-3 at 10. Accepting Sagar's description of events as true, as the Court must at this stage of the proceeding, these remarks demonstrate that Brady was aware of Sagar's age. But they do no more than that, and they certainly do not constitute direct evidence of age-based animus in any employment-related action. Such innocuous remarks "unrelated to the relevant employment decision [do] not, without more, permit a [reasonable] jury to infer discrimination." *Morris*, 825 F.3d at 669; *see also DeJesus*, 841 F.3d at 536 (same); *Elliott v. Acosta*, --- F. Supp. 3d ---, 2018 WL 575559, at *6 (D.D.C. Jan. 26, 2018) (same); *Iyoha v. Architect of the Capitol*, 282 F. Supp. 3d 308, 321 (D.D.C. 2017) ("[T]he alleged discriminatory statements cannot include mere 'stray remarks' that have no bearing on the adverse action being challenged." (citation omitted)); *Vasquez-Mills*

*v. District of Columbia*, 278 F. Supp. 3d 167, 177 (D.D.C. 2017) (quoting *Morris*, 825 F.3d at 669).

Sagar does identify one comment that he alleges was tied to the relevant employment decision: when Sagar "reminded" Brady about the need to complete his annual appraisal, Brady allegedly responded, "You are very senior[;] we have time to get it done." Dkt. 101 at 35; Dkt. 101-3 at 11. It is not at all clear to the Court what inference Sagar would draw from this statement. It *is* clear, however, that no reasonable jury could find that a reference to Sagar's seniority, even in the context of the timing of his appraisal, constitutes direct evidence of age-based animus.

The remarks that Sagar attributes to Gianakos are even less probative. He asserts that Gianakos once asked another employee, Matthew Sikowitz, about that employee's retirement plans, Dkt. 101 at 35, and that, when yet another employee, Walter Kirkland, referred to Andy Rooney's retirement from the television show "60 Minutes," Gianakos said that he "would have let [Rooney, who was 92 years old,] retire 10 years ago," *id*. He also reports that, when Gianakos was escorting Sagar from the building, Sagar asked Gianakos about Gianakos's "injured knee," and Gianakos replied that "he [may be] getting old." *Id*. at 35; Dkt. 101-3 at 12. None of this comes close to constituting direct evidence that Gianakos discriminated against Sagar because of his age or that Gianakos held any age-based animus toward anyone. Andy Rooney once remarked, "It's paradoxical that the idea of living a long life appeals to everyone, but the idea of getting old doesn't appeal to anyone." That none of us like getting older (at least after a point); that we may blame our ailments on our age; and that Gianakos may have grown tired of Andy Rooney's brand of humor after more than three decades does not reflect a workplace bias against older employees.

Finally, Sagar contends that comments made by various "surrogate[s]" of Brady and Gianakos show that Brady and Gianakos discriminated against Sagar because of his age. Each of these statements fail for two reasons: *First*, the statements "cannot constitute direct evidence of discrimination because they were not made by someone who participated in the decision to terminate" Sagar, *Steele v. Carter*, 192 F. Supp. 3d 151, 166 (D.D.C. 2016) (citing *Wilson*, 753 F.3d at 247; *Holbrook v. Reno*, 196 F.3d 255, 260 (D.C. Cir. 1999)), and, despite Sagar's use of the term "surrogate," there is no evidence that any of these individuals spoke on behalf of Brady or Gianakos or with their encouragement. *Second*, these statements do not reflect any bias in any employment-related matter. Walter Kirkland, an IT Project Manager, for example, purportedly told Sagar that he—that is, Kirkland—had worked at Verizon for 26 years and then asked Sagar "how long" he had worked at his previous place of employment. Dkt. 101 at 34. Kirkland also allegedly commented to Sagar, "[Y]our daughter is married and looks great compared to you, you must be in [. . .] ?" *Id.* Another employee, Mariamma Cherian, reportedly told Sagar that she had seen his "daughter's wedding pictures" and said, "[Y]ou must be quite senior[,] close to retirement." *Id.* And Lin, who clashed with Sagar on several occasions, allegedly said to Sagar on his birthday, "I am not yet 60, what about you?" Dkt. 41 at 8–9 (Am. Compl. ¶ 43). Lin was only a couple years younger than Sagar at the time. *See* Dkt. 104 at 21. Even if some of these comments were impolite, none of them would permit a reasonable jury to find that Brady or Gianakos decided to terminate Sagar because of his age.

2. *Circumstantial Evidence of Age Discrimination*

An ADEA plaintiff may also defeat a defendant's motion for summary judgment by offering circumstantial evidence that his employer's "asserted non-discriminatory reason" for taking the adverse employment action "was not the actual reason and that the employer

intentionally discriminated against the employee on the basis of" his age. *Brady*, 520 F.3d at 494; *see also Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1099 (D.C. Cir. 2017) (applying *Brady* in an ADEA case). In deciding "whether summary judgment . . . is warranted for the employer, the court [must] consider[] all relevant evidence presented by the plaintiff and defendant," including circumstantial evidence. *Brady*, 520 F.3d at 495. A plaintiff might, for example, attempt "to show that the employer's stated reason for the employment action was not the actual reason," that the "employer [was] making up or lying about the underlying facts that formed the predicate for the employment decision," that "the employer treated other," younger "employees . . . more favorably," that the employer's account of what happened changed over time or that the employer offered inconsistent reasons for acting, that the employer generally treated older employees less favorably, or that the employer failed "to follow established procedures or criteria." *Id.* at 495 & n.3.

As the D.C. Circuit has reiterated, however, the "relevant factual issue" on summary judgment is not "whether the underlying . . . incident occurred." *Id.* at 496. Instead, the question is "whether *the employer honestly and reasonably believed*" that the incident occurred. *Id.*; *see also Johnson*, 849 F.3d at 1100 n.2 ("Even if Johnson had produced sufficient evidence to dispute whether the infractions occurred, Johnson did not provide sufficient evidence to call into question whether hotel management '*honestly and reasonably believed*' that the infractions occurred."); *Morris*, 825 F.3d at 671 (Plaintiff "must raise a genuine dispute over the employer's honest belief in its proffered explanation."); *accord DeJesus*, 841 F.3d at 533; *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014); *Hampton v. Vilsack,* 685 F.3d 1096, 1101 n.8 (D.C. Cir. 2012); *Vatel*, 627 F.3d at 1248. And "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for

permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

Sagar's principal argument is that the Department's stated reasons for firing him were not true and were pretext for age discrimination, and that a reasonable jury could find discriminatory intent based on the Department's subterfuge. *See Reeves*, 530 U.S. at 147; *Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000). In order to appraise the force of this contention, the Court must consider both the stated reasons for the Department's action and any controverting evidence offered by Sagar. That process is complicated by the fact that Sagar is proceeding *pro se*, and he makes a number of sweeping statements denying that the events occurred as the Department reported. He declares, for example, that the Department "made up events that were disclosed" in the termination letter, that "[t]he performance appraisal conducted by Brady was not factual," and that "Brady made up things and was not honest in his observations." Dkt. 101-2 at 3. From these and other similar assertions, it is difficult to discern whether Sagar disputes the Department's characterization of events or, instead, disputes whether the events, in fact, occurred. It is also unclear whether he disagrees with minor details about the events, such as the precise days on which they purportedly occurred, or whether he disagrees with the essential substance of what the Department reported.

In light of Sagar's failure meaningfully to controvert the specific evidence offered in support of the Department's motion, the Court might have concluded that Sagar had failed to "provide evidence that is sufficient for purposes of summary judgment to cast doubt on the adverse employment record established by the large volume of" evidence, *Johnson*, 849 F.3d at 1100, which includes Sagar's performance evaluation, Dkt. 104-9, the termination letter, Dkt. 104-4, Lin's notes, Dkt. 104-6 at 22–23, and Brady's account of why he recommended Sagar's

dismissal, Dkt. 64-6 at 33–35.  But, in light of the Court's obligation to construe *pro se* pleadings

liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court provided Sagar with the

opportunity at oral argument to clarify the nature and extent of his denials.  *See* Fed. R. Civ. P.

56(e) ("If a party fails to properly . . . address another party's assertion of fact as required by

Rule 56(c), the court may . . . give an opportunity to properly support or address the fact . . . .").

With those clarifications in mind, the Court will review each of the five rationales that the

Department identified in its termination letter.

*First*, the Department stressed Sagar's "unprofessional behavior" at a meeting and, in

particular, the fact that he grabbed the spider conference telephone extension "from a colleague

while [that person] was speaking," "placed it in front" of himself, and, after he was done

speaking, "threw" the microphone "across the table" in the direction of his colleague.  Dkt. 104-4

at 2.  Unsurprisingly, the termination letter reports that this action "was very disruptive to others

in attendance."  *Id.*  In his motion for summary judgment, Sagar responds that he "is not a

psychiatric patient to grab microphones and throw them when done," that Lin—who recorded

this event in his notes, which he later gave to Brady—"perceived something that was not there,"

and that "[t]he event was concocted" because the Department "want[ed] to terminate" him.  Dkt.

101 at 37–38.

When asked about this at oral argument, however, Sagar explained that "it was [his]

practice at times to move [the microphone] towards [him]self, but . . . never . . . when someone

else was talking" and that "it was [his] practice at times to toss the microphone."  Oral Arg. Tr.

(Rough at 11:37).  He acknowledged, however, that he did not recall "the particular meeting"

cited in the termination letter, that he did not recall "whether [he] took the microphone from

someone else while [that person was] speaking," and that he did not recall whether he "tossed or

threw the microphone [in] someone else's direction." *Id.* (Rough at 11:39–40). He also objected to Lin's suggestion that the only "proper way" to give the telephone to someone else was to pass it hand-to-hand. *Id.* (Rough at 11:40).

Understood in this light, Sagar's opposition offers insufficient evidence to permit a reasonable jury to conclude that the telephone incident did not occur and that Lin, Brady, and Gianakos concocted or distorted the episode as pretext for discriminating against Sagar because of his age. Sagar concedes that he does not recall the meeting and that he would, at times, "toss or thr[o]w the microphone [in] someone else's direction." *Id.* (Rough at 11:39–40). Lin, however, made notes regarding the incident. Dkt. 104-6 at 7 (Lin Dep. 42:12–44:19). Like the termination letter, those notes state that Sagar "grabbed the microphone while [Lin] was speaking," "moved it directly . . . in front of him," and then "threw it across the table" in Lin's direction when done. *Id.* at 22. There is no evidence suggesting that Lin, who was himself 59 years old, harbored any age-based animus toward Sagar. To be sure, Lin and Sagar may not have gotten along. But there is no evidence that would permit a reasonable jury to find that Lin fabricated his notes for the purpose of sharing them with Brady months later, that Lin developed a plan to induce Brady to fire Sagar, and that Lin was motivated by age-based animus. Moreover, even if the events did not occur precisely as Lin recorded, and as Brady repeated, "the relevant factual issue" is not "whether the underlying . . . incident occurred" exactly as it was recounted in the termination letter, but whether the deciding officials—or those who may have influenced their decisions, *see Noisette*, 211 F. Supp. 3d at 94—"honestly and reasonably believed" that it occurred as it was recounted. *Brady*, 520 F.3d at 490 (citing *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

*Second*, the Department also relied upon an incident in which Sagar purportedly "chastise[d] another employee after he interrupted [Sagar] during a group discussion." Dkt. 104-4 at 2. Sagar, who was "visibly upset," told the employee that "gentlem[e]n should not interrupt other people while they speak," but then himself interrupted "another team member" during the same meeting. *Id.* Lin recorded in his notes and testified at his deposition that he was the other employee in this interaction and that Sagar "thr[e]w down his pencil," "start[ed] lecturing [him on] how gentlemen should not interrupt other people while they speak," and later interrupted another employee. Dkt. 104-6 at 17 (Lin Dep. 114:16–115:2). In his opposition brief, Sagar argues that this rationale for his termination was also pretextual. He asserts, for example, that the story of what happened "is all concocted," that Lin "habitual[ly]" interrupted Sagar, and "[t]here was no need for [the] interruption in a sane technical discussion." Dkt. 101 at 38. He also asserts, moreover, that Lin "concocted" the story "for pay to play" purposes and that he "was given [an] outstanding rating [as an] award." *Id.* at 39. Once again, however, the basis for Sagar's conclusory assertions is unclear.

When asked to clarify at oral argument, Sagar conceded that he did not, in fact, recall whether he said anything to Lin about interrupting him while he was speaking, although he explained that it was his general practice not to interrupt others. Oral Arg. Tr. (Rough at 11:41–42). Sagar's inability to recall the meeting in question means that the Department's factual account of this event, like the telephone incident, remains largely undisputed and that Sagar has failed to offer any evidence that would permit a reasonable jury to find that the second stated reason for his termination was pretextual. The Department, in contrast, has produced sworn testimony indicating that the incident occurred. Sagar's own pleadings, moreover, confirm that he was frustrated by his interactions with Lin, *see, e.g.*, Dkt. 101 at 38 (referring to Lin's

interruptions as "habitual," to Lin's "antagonis[m]," and to Lin's "shallow technical capabilities"), providing further support for the Department's conclusion that their working relationship had become toxic. But, in any event, the Court need not decide whether Lin's account of what happened is accurate or fair. All that matters for present purposes is whether Sagar has offered "sufficient evidence to call into question" whether the deciding officials—Brady, Gianakos, and Barry—"'honestly and reasonably believed' that that [misconduct] occurred," *Johnson*, 849 F.3d at 1100 n.2, and he has failed to offer any evidence that would permit a reasonable jury to find that they doubted, or had reason to doubt, Lin's rendition of the relevant events.

*Third*, the Department raised performance concerns about Sagar's role as "Requirements Manager for the PTC Project," and, in particular, asserted:

> On August 12, 2011, you were assigned as Requirements Manager for the PTC Project and were responsible for producing the Requirement[s] Plan. The template for this project had been updated[,] but follow-up conversations were required to further explain your responsibility to revise the plan documentation. You still did not understand your role as Requirements Manager, even after several follow-up meetings regarding the same. As a result, it became necessary to assign several junior staff members to assist you with the [P]lan.

Dkt. 104-4 at 3. Sagar first argues that the stated concern with his performance is false because he was assigned to serve as the Requirements Manager in February 2011 and not on August 12, 2011, as the termination letter suggests. *Id.* ("Sagar was the [R]equirements [M]anager all along . . . ."). That, however, is a quibble with a minor detail and not with the substance of the stated concern. All agree that Sagar received the assignment before August 12, 2011. As Brady explained at his deposition, the reference to August 12, 2011 in the letter was not intended to refer to the date he received the assignment but to when Sagar's performance on that assignment fell short. *See* Dkt. 104-8 at 4 (Brady Dep. 35:9–17). Although inartfully phrased, there is no

suggestion in the letter that the purported shortcomings in Sagar's performance had anything to do with the date he was originally assigned the role of Requirements Manager; to the contrary, if he had been assigned that role on August 12, 2011, there would have been little basis to criticize his performance during what would have been his first days in a new role. Sagar's first factual objection, accordingly, is based on a misreading of the letter and, more importantly, is immaterial to the substance of the Department's criticism of his performance. *See Liberty Lobby*, 477 U.S. at 248; *Richardson v. Nat'l Rifle Ass'n*, 871 F. Supp. 499, 503 (D.D.C. 1994) (the factual assertions "either do not support [Plaintiff's] allegation or are immaterial").

Sagar also disputes the letter's assertion that "follow-up conversations were required to further explain [his] responsibility to revise the [P]lan documentation." Dkt. 104-4 at 3. When the Court asked at oral argument whether he disputes that those conversations occurred or merely disputes that they were "required," Sagar conceded that the conversations occurred. *See* Oral Arg. Tr. (Rough at 11:50–51). "[T]hey were not required," in his view, however, and merely took place "because [management] wanted the others to learn from [his] experience." *Id.* (Rough at 11:50–51). But Sagar offers no evidence to support his speculation why his managers initiated the conversations. The Department, in contrast, has offered competent evidence that supports the letter's description of the relevant events. *See, e.g.*, Dkt. 62-7 at 11 (Brady Dep. 38:1–18); Dkt. 104-7 at 8 (Sikowitz Dep. 113:4–8). To be sure, Sagar may sincerely believe that the meetings were not necessary, and he may even be right. But it is not the Court's role to put itself in the place of Sagar's managers and to decide what was necessary, or, indeed, to decide whether Sagar performed well—or not. *See Brady*, 520 F.3d at 495. Rather, the Court's role is limited to determining whether Sagar has produced evidence that would permit a reasonable jury to find

that the termination letter includes statements that the deciding officials believed to be false and that those statements were included as a pretext for discrimination. *Id.* He has not done so.

The same is true with respect to the next sentence of the termination letter. Sagar does not dispute that "several follow-up meetings" took place, but he disagrees with the assessment that he "did not understand [his] role as Requirements Manager" even after they occurred. Dkt. 104-4 at 3; *see* Oral Arg. Tr. (Rough at 11:51–53). As Sagar explained at oral argument, what he disputes is the premise that he did not know what he was doing. Oral Arg. Tr. (Rough at 11:52–53). In Sagar's words, "No discussion was necessary[;] I knew my job." *Id.* (Rough at 11:52). Subjective, personal assessments of that type, however, are insufficient to establish a triable issue of fact in a discrimination case. As the D.C. Circuit has explained, "[i]t is settled that 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *Vatel*, 627 F.3d at 1247 (citation omitted); *see also Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015); *Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 229 (D.D.C. 2017); *Bell v. Donley*, 928 F. Supp. 2d 174, 180 (D.D.C. 2013); *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008).

This, then, leaves the final sentence of the paragraph, which asserts that "it became necessary to assign several junior staff members to assist [Sagar] with the" Performance Plan. Dkt. 104-4 at 3. Sagar disagrees, but that disagreement is, again, unsupported by any evidence that would permit a reasonable jury to find that the assertion constitutes pretext for discrimination. Brady explained at his deposition that Sagar completed an earlier version of the Requirements Plan but that, subsequently, "the template . . . was updated [and the] [R]equirements [P]lan needed to be updated to follow the new template." Dkt. 104-8 at 4 (Brady Dep. 35:20–36:6). According to Brady, at that point, he asked Walter Kirkland and an outside

contractor to assist in completing the Plan.  Dkt. 62-7 at 10–11 (Brady Dep. 37:18–38:18).

Brady's notes, which he shared with Labor Relations, also reflected that "[s]everal junior staff [members] had to step in to assist [Sagar] in getting started and understanding the process."  Dkt. 64-6 at 33.

Matthew Sikowitz, another Technology Specialist, confirmed Brady's account.  He testified that "Sagar could not produce a final version [of the Requirements Plan] that was acceptable for signature," Dkt. 104-7 at 8 (Sikowitz Dep. 113:4–8); that "Kirkland asked [Sikowitz] to help out on getting the document finalized," *id.* (Sikowitz Dep. 113:4–8); that Sagar "sent [the draft] to [him] at Walter's request," *id.* at 11 (Sikowitz Dep. 122:5–7); and that Sikowitz "revised it," *id.* (Sikowitz Dep. 122:5–7).  Sikowitz explained:

> [There] was a template . . . and you had to fill in how the project was going to conduct the requirements gathering, what tools [were] going to be used, and how various things were going to be measured, like project scope and number . . . of requirements and difficulty, and some of these things needed to be finalized.  And Walter [Kirkland] asked me to step in and work on some of them.

*Id.* at 8 (Sikowitz Dep. 113:12–20).  Sikowitz further clarified that, for the "Requirements [P]lan, [he] assisted [Sagar] . . . before [Sagar] left" and that he "took over [the separate] requirements development after [Sagar] left."[2]  *Id.* at 9 (Sikowitz Dep. 116:15–17).

Sagar at times suggests that he—and he alone—performed all of the work on the final Requirements Plan, but he also concedes that others were involved.  Thus, in his "narrative response" to his performance evaluation, Sagar wrote: "*With team input*, the [Requirements Plan]

---

[2]  Although directed principally at that separate "requirements development" project, a declaration provided by Walter Kirkland avers that he "personally and repeatedly urged . . . Sagar to schedule a requirements review meeting, so that the finalized requirements could be produced," Dkt. 104-16 at 3 (Kirkland Decl. ¶ 5); that "Sagar organized a meeting after multiple requests from [Kirkland] and from . . . Gianakos," *id.* (Kirkland Decl. ¶ 6); that, "[n]otwithstanding the meeting, [Sagar] produced no finalized requirements," *id.* (Kirkland Decl. ¶ 6); and that he "asked . . . Sikowitz and others to help [him] complete the process," which was ultimately "done in the fall of 2011 after . . . Sagar left the agency," *id.* (Kirkland Decl. ¶ 6).

was completed *by me* from start to finish." Dkt. 56-17 at 3 (emphasis added). More importantly for present purposes, he clarified at oral argument that much of his disagreement with the Department's assertion that others assisted on the Plan is not based on personal knowledge, and that which is based on personal knowledge is a matter of subjective characterization. He agreed, for example, that "junior people were assigned or coming to the [R]equirement . . . [P]lan meetings," but assumed that they attended only "to learn" or because they did not have other work to do. Oral Arg. Tr. (Rough at 11:53–59). He conceded, however, that he was not involved in assigning the junior staff. *Id.* (Rough at 11:59). More significantly, Sagar does not dispute that Kirkland—who, as a GS-14, was slightly junior to Sagar—was asked to edit the draft Requirements Plan. *Id.* (Rough at 11:53). He merely contends that Kirkland's assistance "was not required because editing was done by a different unit under the ACA." *Id.* (Rough at 11:53). In other words, he does not dispute that Kirkland contributed to the Plan, but simply maintains that his assistance was unnecessary because others in the Department would have eventually edited his work.

Understood in this light, the Court cannot conclude that Sagar has offered any evidence that would permit a reasonable jury to find that the third set of events described in the termination letter constituted prextext for age discrimination. *Bell*, 928 F. Supp. 2d at 180.

*Fourth*, the Department relied on Brady's frustration with a meeting that Sagar scheduled—and invited the entire team to attend—regarding the Requirements Plan, but at which Sagar was "not prepared to present and proceeded," instead, "to make corrections" to the Plan "during the discussion." Dkt. 104-4 at 3. As a result, according to the termination letter, Brady decided to "adjourn the meeting" and to ask "others to step in [to] complete the document." *Id.* To the extent that Sagar disputes Brady's assertion that others helped with the Plan, his challenge

to that portion of the rationale fails for the reasons just discussed. As Sagar explained when asked about this at oral argument, he does not dispute that Kirkland edited his work; he merely contends that the edits were unnecessary. Oral Arg. Tr. (Rough at 11:53).

Sagar also disputes that he made corrections to the Plan during the meeting, offering that he was actually only taking notes on his computer. *Id.* (Rough at 12:07–08). Sagar's suggestion that Brady misunderstood what Sagar was doing—and incorrectly thought that he was making corrections to the Plan itself, rather than simply taking notes—however, does not constitute evidence of pretext or discriminatory intent. The relevant question, once again, is not whether the employer's proffered, nondiscriminatory reason for taking an adverse action is correct, but whether the "employer honestly believe[d]" that it was correct. *Fischbach*, 86 F.3d at 1183. That principle, moreover, also disposes of Sagar's contention that he was as prepared as he could have been for the meeting and that he only learned about changes to the template at the meeting; Sagar offers no evidence that would allow a reasonable jury to find that Brady's assessment of Sagar's preparation was not merely mistaken, but dishonest. *See* Oral Arg. Tr. (Rough at 12:05–07). Finally, Sagar contends that Brady did not adjourn the meeting and that it, in fact, lasted an hour. *Id.* (Rough at 12:13). That contention is at best peripheral to the substance of Brady's criticism, which would stand regardless of whether Brady, in fact, adjourned the meeting early.

*Finally*, the termination letter stressed that Brady met with Sagar "to discuss both performance and conduct issues" and that, "[u]nfortunately, [Sagar] did not agree that there was any need for improvement." Dkt. 104-4 at 3. Sagar contends that this assertion was "false," but, in the same breath, confirms that—to this day—he does not believe that his conduct or performance called for any improvement. Dkt. 101 at 41. As Sagar puts it, he "did outstanding work in program leadership, employee satisfaction, customer satisfaction, business results,

professional expertise," and timeliness.  *Id.*  The falsity that he posits, instead, is the assertion

that Brady met with him "to discuss both performance and conduct issues."  *Id.*  That statement

was false, according to Sagar, because "[t]he annual appraisal meeting was brief."  Dkt. 101-3 at

8 (First Sagar Decl.).  But Sagar himself submitted a declaration attesting that "[a]round

September 29, 2011 Brady prepared [the] . . . evaluation *and discussed it* with" Sagar.  *Id.* at 5

(First Sagar Decl.) (emphasis added).  He also concedes that he responded, in writing, to the

appraisal, *see* Dkt. 56-17 at 2–4, and a review of that document shows that Sagar failed to

acknowledge the need to improve in any respect.  Later, moreover, he wrote to Barry asserting

that the appraisal was "not factual" and that it was a "180[-]degree distortion."  Dkt. 100-20 at 2.

Accordingly, there is no genuine dispute that Sagar "did not agree that there was any need for

improvement," Dkt. 104-4 at 3, and that he repeatedly made his disagreement known.

*      *      *

For all of these reasons, the Court concludes that no reasonable jury could find that the

Department's proffered explanations for Sagar's dismissal were pretextual, much less that the

Department's actual reason for terminating Sagar was his age.  The Court will thus grant the

Department's motion for summary judgment on Sagar's termination claim.[3]

---

[3]  Sagar asserts that his termination violated various personnel policies, Dkt. 101 at 20–21, which
the Department disputes, Dkt. 104 at 25.  Sagar advances a number of theories as to why the
Department's investigation and termination were deficient.  These theories suffer from legal or
factual flaws.  For instance, Sagar contends that Barry "rel[ied] on hearsay" in approving Sagar's
termination.  Dkt. 101 at 20–21.  The hearsay rule, however, does not apply to an employer's
personnel investigations.  Sagar also asserts that persons known and unknown "t[a]mpered" with
or "falsely completed" various forms.  *Id.* (referring to Form 6771 and Form 12450-B); *id.* at 47
(referring to Form 11396).  But he has provided no evidence to substantiate these assertions.
And, even putting these flaws aside, Sagar has failed to argue—or to present any evidence—that
any such procedural defect "gives rise to an inference of discrimination."  *Kilby-Robb*, 246 F.
Supp. 3d at 199.

**B.      Retaliation Claim**

The ADEA prohibits employers from retaliating against an employee who complains of age discrimination.  *See Jones*, 557 F.3d at 680 ("[T]he ADEA protect[s] employees who engage in . . . protected activity."); *see also Gomez-Perez*, 553 U.S. at 479.  "To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by [the ADEA]; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action because the employee opposed the practice."[4]  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)).  There is no dispute that Sagar suffered a "materially adverse action" when he was terminated on November 2, 2011.  Sagar's claim fails, however, at both the first and third prongs of the standard.

Sagar attempts to rely on a number of activities that fall beyond the reach of the ADEA's anti-relation provision.  He contends, for example, that he made charges under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, against Brady and Gianakos for "duplicating consulting work," for violating rules relating to "open bidding," and for using "federal employees who had little work in place of vendor consultants of unknown talent/qualification."  Dkt. 101 at 45.  None of these charges "opposed any practice made unlawful by" the ADEA, 29 U.S.C. § 623(d), and thus none constitutes a protected activity for purposes of the ADEA.  *See Harris*, 791 F.3d at 68.

Sagar does, however, allude to one activity that comes closer to the mark—he asserts that he "approached concerned offices/individuals around" October 18, 2011, "for help."  Dkt. 101 at

---

[4]  Although not at issue here, a plaintiff may also premise an ADEA retaliation claim on his participation in "an investigation, proceeding, or litigation under" the ADEA.  29 U.S.C. § 623(d).

46. In particular, Sagar avers that in September or October of 2011, he "called and talked with Cassandra Williams," an "[e]mployee [in] Labor Relations," to "initiate a grievance and EEO complaint." Dkt. 101-5 at 3 (Sixth Sagar Decl. ¶ 11). Sagar "believe[s]" that he "followed . . . up with an email," and he asserts that Williams told him that EEO complaints were "not admissible" for probationary employees. *Id.* (Sixth Sagar Decl. ¶ 11). Email correspondence submitted with the parties' summary judgment motions confirms that, on October 18, 2011, Sagar asked Jean Bell, another IRS employee, about the "[g]riev[a]nces [p]rocess," and Bell directed Sagar to Williams. Dkt. 104-13 at 3. Sagar and Williams evidently spoke that same day, and Williams followed up with an email: "Mr. Sagar - Per our conversation, the [Internal Revenue Manual] 6.771.1 will provide guidance on the Agency Grievance System for Non-Bargaining Unit." *Id.* at 2.

It is far from clear from this record—or from any other evidence—that Sagar complained in October 2011 to Williams or anyone else about *age* discrimination. Indeed, by Sagar's own account, he merely asked Williams how to initiate a "grievance and EEO complaint" and was told that a probationary employee could not do so. The record does not show that he referred to his age or described the substance of his claim. But, giving Sagar the benefit of the doubt and assuming that such a general inquiry about how to initiate an EEO complaint constituted protected activity for purposes of the ADEA, Sagar still fails to offer any evidence that would permit a reasonable jury to find that he was fired because he engaged in that protected activity. *See Harris*, 791 F.3d at 68. Most significantly, by October 18, 2011—the day on which Sagar was referred to Williams and asked her about "the Agency Grievance System for Non-Bargaining Unit" employees, Dkt. 104-13 at 2—Brady had already decided to move forward with Sagar's termination. *See* Dkt. 104-8 at 3 (Brady Dep. 31:8–22) (Brady decided to fire Sagar

"after the evaluation meeting" on September 29, 2011).  Indeed, by Sagar's own theory of the case, the deficiencies identified in Sagar's performance evaluation, which was delivered on September 29, 2011, *see* Dkt. 104-4 at 3; Dkt. 104-9, were contrived to create the record that would permit his termination.  *See* Dkt. 101 at 27.  Brady, of course, could not possibly have initiated Sagar's termination in late September 2011 in retaliation for Sagar's inquiry to Williams three weeks later, on October 18, 2011.

Although this timeline provides ample basis for rejecting Sagar's retaliation claim, the claim fails for a second reason as well: the record is devoid of any evidence that Sagar's managers were aware that he intended to pursue the EEO process *at any point* leading up to his termination.  Brady and Gianakos testified under the penalty of perjury that they were not "aware of any EEO activity until after [Sagar] was terminated."  Dkt. 104-1 at 6 (Brady Decl. ¶ 19); Dkt. 104-2 at 8 (Gianakos Decl. ¶ 22).  And, despite engaging in extensive discovery and taking numerous depositions, Sagar has failed to identify any evidence that even arguably undercuts this testimony.  Under these circumstances, no reasonable jury could find that Brady and Gianakos recommended that Sagar be fired because he opposed a practice made illegal by the ADEA.

The Court will, accordingly, grant the Department's motion for summary judgment on Sagar's ADEA retaliation claim.

## C.    Hostile Work Environment Claim

To prevail on a hostile work environment claim, an employee must demonstrate that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult" and that this conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted); *see also Baird v. Gotbaum*, 662 F.3d

1246, 1250 (D.C. Cir. 2011).  This standard requires that the employee show (1) that he is "a member of a protected class;" (2) that he "was subjected to unwelcome harassment;" (3) that "the harassment occurred because of the plaintiff's protected status;" (4) that "the harassment affected a term, condition, or privilege of employment;" and (5) that "the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it." *Moore v. Castro*, 192 F. Supp. 3d 18, 53 (D.D.C. 2016) (quoting *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)); *see also Smith v. Jackson*, 539 F. Supp. 2d 116, 137 (D.D.C. 2008).  In assessing a hostile work environment claim, the Court must examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted).

Sagar's complaint does not clearly delineate the acts that he contends gave rise to an age-based hostile work environment.  Because he is proceeding *pro se*, however, the Court will once again give him the benefit of the doubt, *see Erickson*, 551 U.S. at 94, and will consider each of the acts that he identifies in his summary judgment briefing.  Starting with Sagar's motion for summary judgment, he identifies the following acts that allegedly created a hostile work environment: (1) Sagar had to "work under lower[-]grade [Premium Tax Credit] managers as well as vendor consultants," while Lin "misbehaved" and "was pampered;" (2) Sagar was "not authorized to attend meetings at [the Department of Health and Human Services ("HHS")], the agency that was framing the requirements," even though Lin was permitted to attend; (3) Sagar "was left behind when others discussed requirements with users and vendor consultants;" (4) Lin

was "encouraged to concoct two events listed in the termination letter [in exchange] for [receiving an] outstanding ranking, recommendation for a reward, and promotional consideration;" (5) Sagar "received threatening [telephone] calls from IRS officials" beginning "sometime in 2011;" (6) Brady and Gianakos made "false statements in [F]orm 11396 and delet[ed] [the] rating official's electronic signature[] from the . . . official performance agreement;" and (7) Sagar was denied a transfer to another project. Dkt. 101 at 47. Sagar's combined reply and opposition repeats some of these alleged acts of harassment and adds four more: (9) Kirkland contacted "users" directly without involving Sagar, the requirements manager; (10) Sagar was "removed" from a project and replaced by Lin; (11) Sagar "was ignored" while "visiting [an] Austin processing center . . . in favor of Brady and Kirkland;" and (12) Lin complained about Sagar. Dkt. 112 at 39–41.

Sagar's hostile work environment claim fails for several reasons. *First*, "[d]espite the sheer number of incidents of which [Sagar] complains," his claim "contains at least one glaring defect: none of the allegations give rise to an inference of discrimination by [the Department] based on [his] age." *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003). Without some connection to his age, none of these incidents can support a claim of age-based harassment under the ADEA. *See Baloch*, 550 F.3d at 1196 (ADEA claim requires evidence that the challenged action was taken "because of the plaintiff's . . . age"). Not only has Sagar failed to proffer any evidence that he suffered these alleged indignities because of his age, much of his challenge centers on the contention that Lin—who was 59 years old at the time—was favored over him. He alleges that Lin was "pampered," allowed to attend meetings at HHS, encouraged to say negative things about Sagar in exchange for favorable reviews and rewards, and was substituted for Sagar on a project. It is theoretically possible, to be sure, that an employer might

discriminate on the basis of age in favor of a 59-year-old employee at the expense of a 63-year-old employee. But to make out such a claim, the 63-year-old employee would need to identify *some* evidence supporting that unlikely scenario. Sagar has not done so. Indeed, Sagar himself attributes the complained-of events to other causes: "poor and unconventional management," Dkt. 101 at 47, and Brady and Gianakos' allegedly inexplicable dislike of Sagar, Dkt. 112 at 41. Bad behavior, however, "no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).

*Second*, even putting that flaw aside, Sagar's allegations of harassment do not rise to the level of severe or pervasive "intimidation, ridicule, [or] insult" necessary to state a hostile work environment claim. *Baloch*, 550 F.3d at 1201. Sagar was given an important role to play in developing the Requirements Plan, and he attended multiple internal meetings. *See* Dkt. 101 at 37, 40. The fact that he was not invited to attend meetings with another agency; was "ignored" while visiting a processing center; was not included in certain discussions; was replaced on one assignment; and did not have direct contact with certain "users" may have caused Sagar frustration, may have made it more difficult to do his job efficiently, and may have been insulting.[5] *Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006). But none of those slights, nor any similar conduct, was so severe and pervasive that it "alter[ed] the conditions of [his] employment and create[d] an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).

---

[5] Sagar's contention that Lin concocted criticisms of Sagar at the behest of Brady and Gianakos in exchange for receiving an outstanding ranking, recommendation for a reward, and promotional consideration finds no support in the record.

*Third*, Sagar's contention that he was denied a transfer to another project does not support a claim of pervasive harassment and, even if considered as a discrete claim of discrimination, it fares no better than his termination claim. The undisputed evidence shows that, on October 3, 2011, Brady emailed a group of Department employees about an opportunity for a temporary detail as a project manager to another team. *See* Dkt. 56-53. Even though Sagar expressed interest, *id.*, Brady decided "not to submit [his] name" based on "the fact that . . . they wanted a [GS-]14 level"—and Sagar was a GS-15—and "based on [Sagar's] performance." Dkt. 62-7 at 17 (Brady Dep. 62:3–18). The second of these rationales mirrors the reason why Brady recommended Sagar's termination, and, for the reasons given above, Sagar has failed to offer any evidence that would permit a reasonable jury to find that Brady's rationale was pretextual. Moreover, as discussed above, by the time Sagar expressed interest in the detail in October 2011, Brady had already decided to move forward with Sagar's termination. *See* Dkt. 104-8 at 3 (Brady Dep. 31:8–22) (Brady decided to fire Sagar "after the evaluation meeting" on September 29, 2011). It is thus not at all surprising that Brady did not submit Sagar's name for a new project; he had already decided that Sagar's employment should be terminated.

*Fourth*, and finally, Sagar's contention that he received threatening telephone calls does not support his hostile work environment claim. The Department, in an earlier round of briefing, noted that Sagar had not alleged that the telephone calls were "placed during his employment." Dkt. 55 at 12–13. Sagar responded by asserting in a brief that the calls "started sometime in 2011 while Sagar was still" employed by the Department. Dkt. 56 at 36. But, although Sagar has submitted declarations addressing other aspects of his claim that he received threatening calls, he has not produced any *evidence*—in the form of a declaration or otherwise—supporting his assertion that the calls began in 2011. Moreover, with one exception, Sagar offers no

evidence tying *any* of the calls he allegedly received to anyone who he alleges harbored any age-based animus against him or who played any role in his termination. To the contrary, like a common telephone scam, *see* Dkt. 104-18, the messages that Sagar had transcribed merely directed that he return a call to someone from the "tax litigation department . . . as soon as possible" to address a "deficiency in [his] income tax" and to avoid "legal action," Dkt. 63-1 at 4.

Where Sagar does submit evidence purporting to tie certain calls to someone who allegedly played a role in his termination or harassment, the evidence fails to support his claim. He avers, in particular, that he received a call in December 2013 from a "gentleman [who] gave his name as Jonathan Lin"—the "same name as the employee who [was] used by Front Line Managers" to concoct false allegations of misconduct. Dkt. 101-2 at 3–4 (Fourth Sagar Decl. ¶ 20). Unlike some of the other calls that Sagar relies upon, he does not offer a certified transcript of this message and relies, instead, on his own notes. Those notes assert that Sagar received a call, much like those described above, from someone asserting that "[t]here [was] a criminal complaint against [him]" and requesting that he call the "Criminal Investigation Department." Dkt. 63 at 2. When Sagar returned the call, "the gentleman" purportedly indicated that "[h]is name was Jonathan Lin" and asserted that there was a "criminal complaint against" Sagar. *Id.* In response, Sagar "[i]nquired about the nature of the complaint and whether [the caller] could call . . . back to confirm that he was calling from a gov[ernment] phone." *Id.* The caller replied, "'[I]f you don't want this call, just hang up and we w[ill] take legal action.'" *Id.* Again, as the Department notes, this call sounds much like the "sophisticated phone scam targeting taxpayers" about which the IRS warned the public in October 2013. Dkt. 104-18. But, even assuming—improbably—that the "gentleman" with whom Sagar spoke was the same Jonathan Lin who

worked on the Premium Tax Credit project at the IRS, the call, while bizarre, would not support an ADEA hostile work environment claim for at least two reasons: first, by the time Sagar received these calls, he had not worked at the Department for over two years, and, second, there is no evidence that the call had anything to do with Sagar's age.

As a result, even considering the evidence in the light most favorable to Sagar, a reasonable jury could not find in his favor on his claim for a hostile work environment. *See Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 84–85 (D.D.C. 2015); *Nguyen v. Mabus*, 895 F. Supp. 2d 158, 191 (D.D.C. 2012). The Court will, accordingly, grant the Department's motion for summary judgment on this claim as well.

## CONCLUSION

The Court will **GRANT** the Department's motion for summary judgment, Dkt. 104, and will **DISMISS** this case.

A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: April 12, 2018